STATE of Missouri, Respondent,

v.

Leon Arthur ROGERS, Appellant.

No. 56186.

Supreme Court of Missouri,
Division No. 2.

Dec. 13, 1971.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

Robert S. Kilker, J. Dennis O'Leary, St. Louis, for appellant.

DONNELLY, Judge.

Appellant, Leon Arthur Rogers, was convicted of robbery in the first degree by a jury in the Circuit Court of the City of St. Louis, Missouri, and his punishment was assessed at imprisonment in the custody of the State Department of Corrections for a term of twelve years. Following rendition of judgment and imposition of sentence an appeal was perfected to this Court.

On November 7, 1969, Harry Hearst, a real estate dealer, went to the front door of a building at 2321 Maiden Lane in the City of St. Louis. While standing there, Hearst was assaulted from the rear, a struggle ensued, Hearst drew a gun from his waistband, the gun was wrestled from him, he was "pistol-whipped" with the gun, and was robbed of the gun and some money. Hearst identified appellant at trial as the robber.

We reverse and remand because appellant was denied his constitutional right to confront and cross-examine under Art. I, § 18(a), Const. of Mo., V.A.M.S., and the Sixth and Fourteenth Amendments to the Constitution of the United States.

Levi Lemons, *a witness for the State,* testified that he was the operator of a confectionery and package liquor store, that he knew appellant, and that appellant frequently came into his store. The following then occurred on direct examination:

"Q Did you have a conversation with that man on that morning about any particular thing? A No, I didn't.

Q Did you talk to him when he came in on the 8th? A I didn't talk, no, sir.

Q Did you see him on the 8th? A Well, I was there every day he was around there.

Q What did you talk to him about? A I didn't talk to him, sir.

Q Now, wait a minute. Do you recall talking to me just a few minutes before? Did you have a conversation with this man about a gun? A No, I did not."

The assistant circuit attorney then advised the trial court, out of the hearing of the jury, that Lemons "told me not three-quarters of an hour ago in my office" that appellant tried to sell Lemons an automatic pistol the day following the robbery. The trial court then ruled that the State could "cross-examine on the ground of surprise," and the following then occurred:

"Q (Mr. Kitchin) Mr. Lemons, did you or did you not talk to me in my office between 1:30 and 2:00 o'clock today?

A Yes, sir, I did.

Q All right. And didn't you in fact tell me, sir, that this man had been in your confectionery and tried to sell you a gun?

A No, sir, I didn't tell you that.

Q You don't remember that? A No, sir, I didn't tell you that.

Q What did you tell me? A I said he was in there and talking with people, and I said I had been in a small matter and I wasn't talking to him, but when I catch him in my store I asked him out; whenever he walked in there, I don't have a conversation with him.

Q Did you tell me, while you didn't see a gun—you told me you didn't see a gun but he did try to sell you a gun as well as some other people?

MR. MYKINS: Your Honor, I object to that.

Q (Mr. Kitchin) Did you tell me that?

MR. MYKINS: Excuse me. Just a minute before you answer. Your Honor, I object to this line of interrogation. There is no showing that there was a gun, if there was a gun, it is related to this particular incident. I ask that the answer be stricken, and move for the discharge of the jury and for a mistrial.

THE COURT: Very well.

Q (Mr. Kitchin) Didn't you tell me that?

A I didn't tell it the way you said it.

Q Did he try to sell the gun to you or not?

A I told you in the room that he didn't try to sell it to me.

MR. MYKINS: I object to that.

THE COURT: Pardon me. Your objection may go to the whole line of questions.

MR. MYKINS: Very well.

Q (Mr. Kitchin) Did he try to sell you that gun?

A No, sir.

Q Whom did he try to sell it to? A I was working in there and I heard someone talk about a gun. I didn't say he was trying to sell it to me. I tried to tell you that I wasn't talking to him at all. He and I had a little misunderstanding.

Q Mr. Lemons, you knew what case you were coming down to testify in, and the facts, did you not? You were called on the phone by an investigator from this office and told to stand by for possible testimony this week, were you not?

A I recall but I didn't know what I was called for.

Q Weren't some detectives on the 8th of November in your confectionery and asked you some questions about it?

MR. MYKINS: Let me object to the argumentative form of the question. This is his own witness. I object to that.

THE COURT: Well, he is claiming surprise. Let him cross-examine.

Q (Mr. Kitchin) Isn't that correct? Some detectives came into your confectionery on November 8th and questioned you?

A I can't recall. They comes in every day. Police mens and detectives every day be in there.

Q Isn't it a fact that Officer Elliott and Officer Sanders—Sanders of which is now in the back room—came into your confectionery on November 8th, and you told them that man (pointing) whom you knew as—just a minute—'Baby Bro'— 'Baby Bro' tried to sell you an automatic pistol; is that true or not true?

A Not true because—

Q Because what? A Because like I told you, I wasn't talking to him. I never

do talk to him. When he come in the store, I just wait on him and he leaves out.

THE COURT: Well, pardon me. That is not necessary. You may get into trouble for the witness to elaborate. Just cross-examine.

Q (Mr. Kitchin) Did he come in there with another person known to you as 'Screw Jack'? A Not that I recall. I told you before all the time he has been there quite a few times. I don't have time to watch people. Too many peoples in there.

Q Between November 8th and the present day have you seen any more of this man? A Well, he associate with all the guys around there.

Q Does that fact have anything to do with your making the statement that you now made in this courtroom a minute ago that he didn't try to sell you a gun? A I said he didn't try to sell me no gun.

Q And you didn't tell me between 1:30 and 2:00 o'clock today when you got down here that that man tried to sell you a gun; is that what you are saying? A Not that particular man. I told you in the room I don't associate with him.

MR. KITCHIN: I have no further questions."

We recognize the practical problem presented when the State places a witness on the stand and he then fails to say what the State expects him to say. The legal problems presented have also drawn attention (see Wigmore on Evidence (3d ed.), § 1018; McCormick on Evidence, § 39; California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489; Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213; State v. Kinne, Mo.Sup., 372 S.W.2d 62; Jett v. Commonwealth, Ky., 436 S.W.2d 788; Gelhaar v. State, 41 Wis.2d 230, 163 N.W.2d 609; United States v. De Sisto, 2 Cir., 329 F.2d 929).

However, on the record in this case, we must condemn what occurred for the same reasons stated in Douglas v. Alabama, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934: (1) Although the questions asked "were not technically testimony," they "may well have been the equivalent in the jury's mind of testimony that [Lemons] in fact made the statement"; (2) "Since the [State's attorney] was not a witness, the inference * * * that [Lemons] made the statement could not be tested by cross-examination"; and (3) "Similarly, [Lemons] could not be cross-examined on a statement imputed to but not admitted by him."

The applicable law in Missouri was stated in State v. Drummins, 274 Mo. 632, 647, 204 S.W. 271, 276: " * * * We held in the case of State v. Bowen, 263 Mo. [279] loc. cit. 280, 172 S.W. 367, that it is not sufficient to warrant a party who puts a witness on the stand, in impeaching such witness (by showing extrajudicial statements contradictory of the testimony of the witness upon the stand), that the witness merely fails or refuses to tell the facts which he had theretofore related extrajudicially or fails to tell all of such facts, but, in order to warrant impeachment in the mode stated, the witness must go further, and by relating wholly contradictory facts become in effect a witness for the adverse side. In the latter event the party calling the witness is entitled to show that he was misled and entrapped by the witness' former words and attitude into calling the adverse witness. He is not so entitled, however, when the witness merely fails to relate facts which the party offering him had been led to believe he would relate."

We must conclude, on the record in this case, that the assistant circuit attorney "was really testifying." State v. Hogan, 352 Mo. 379, 383, 177 S.W.2d 465, 466. "It is obvious that the object of the examination * * * was not to impeach the witness but to obtain the benefit of the statements which the witness had pre-

viously made." State v. Gordon, Mo.Sup., 391 S.W.2d 346, 349. We cannot approve what happened here. Cf. State v. Harvey, Mo.Sup., 449 S.W.2d 649, 652.

The judgment is reversed and the cause remanded.

All of the Judges concur.